JDN

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tony Deng, | No.  CV 19-04589-PHX-JAT (JFM) |
| Plaintiff, | |
| vs. | **ORDER** |
| Charles Ryan, et al., | |
| Defendants. | |

Plaintiff Tony Deng, who is confined at the Arizona State Prison Complex (ASPC)-Eyman Cook Unit, in Florence, Arizona, brought this pro se civil rights action under 42 U.S.C. § 1983 against Nurse Practitioner (NP) Kendra Avant-Ortiz and Centurion of Arizona L.L.C., the private company contracted with the Arizona Department of Corrections (ADC) to provide prisoner health care.  (Doc. 1.)  Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 58.)  The Court will deny the Motion.

## I.    Background

In his Second Amended Complaint, Deng alleged that he has been denied adequate medical care for his diabetes.  (Doc. 12.)  He stated that he is prescribed five medications, including insulin, to control his diabetes, and he must take the medications every day.  (*Id.* at 11.)  Deng alleged that in August 2019, he submitted a health needs request (HNR) informing NP Ortiz that he was about to run out of his keep-on-person (KOP) medications; however, he did not receive his medications for over a month, and only after he submitted

more HNRs, an informal complaint, and an emergency grievance on the issue. (*Id.*) Deng claimed that NP Ortiz knew how critical diabetes medications are for him, knew that he had not received his necessary medications, and failed to ensure he received the medications. (*Id.* at 12.) Deng further alleged that Centurion did not take corrective action in response to medical staff's failure to provide necessary care, nor does it have an adequate medication re-fill system or procedure in place and, consequently, Deng went 32 days without vital medications. (*Id.*)[1] Deng sought money damages, declaratory relief, and injunctive relief. (*Id.* at 17.)

Defendants move for summary judgment on the grounds that (1) Deng failed to show any deliberate indifference, (2) Deng cannot show that he suffered any actual injury as a result of Defendants' conduct, (3) NP Ortiz is entitled to qualified immunity, and (4) punitive damages are not warranted. (Doc. 58.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 200). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

---

[1] Deng's Eighth Amendment medical care claims against NP Ortiz and Centurion are set forth in Count Three of his Second Amended Complaint. (Doc. 12.) On screening, the Court dismissed the other Counts and Defendants. (Doc. 14.)

jury could return a verdict for the nonmovant.  *Anderson*, 477 U.S. at 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).  Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

Finally, where the plaintiff seeks injunctive relief, the court may also consider developments that postdate the motions to determine whether an injunction is warranted. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

**III.    Relevant Facts**

Deng is diagnosed with Type 2 diabetes, as well as glaucoma, hypertension, and hyperlipidemia (high cholesterol). (Doc. 12 at 11, 18; Doc. 59-1 at 2.)  He is treated under the chronic-care program provided by Centurion.  (Doc. 12 at 11; Doc. 59-1 at 2.)  Deng is prescribed Lisinopril for his hypertension; Metformin and Glipizide for his diabetes; Timolol and Latanoprost eye drops for his glaucoma; and Atorvastatin for his

hyperlipidemia.  (Doc. 59-1 at 2.)  He is also prescribed Aspirin and Naproxen as needed.  (*Id.*)  Deng has taken these medications for the past 20 years.  (Doc. 12 at 11.)

### A.    Prescription Order History for Metformin, Glipizide, and Atorvastatin

Deng's claim arose during his confinement in the ASPC-Eyman Special Management Unit (SMU) I.  (Doc. 66 at 14, Pl. Aff. ¶ 3.)  To obtain a refill of a KOP medication, a prisoner must submit an HNR requesting a refill.  (Doc. 59 ¶ 30.)  The HNR is reviewed by staff to determine if a provider review is necessary, and if so, the HNR is sent to the provider for review.  (*Id.*)  The provider approves the prescription refill, and the prescription order is sent to the pharmacy, which orders the medication from an outside pharmacy vender.  The pharmacy then receives the medication from the vender.  (*Id.*)  Prisoners housed in SMU I do not obtain medications directly from the pharmacy.  (Doc. 67 ¶ 23.)  Rather, the pharmacy dispenses medications to the medical unit at SMU I, and then nurses distribute medications to the prisoners.  (*Id.*; Doc. 59 ¶ 30.)

A Drug Prescription Order form shows that on February 7, 2019, NP Ortiz issued a new prescription order for Metformin (1 tablet twice a day); it was set to expire on August 6, 2019.  (Doc. 59-1 at 16, 24.)  The prescription order provided that 60 tablets—a one-month supply—were to be dispensed as KOP each month, and there were 5 refills.  (*Id.* at 24–25.)  The Medication Administration Record shows that the last refill was dispensed on July 9, 2019.  (*Id.* at 25.)[2]

A Drug Prescription Order form shows that on January 22, 2019, NP Ortiz issued a new prescription for Glipizide (1/2 tablet twice a day), which had an expiration date of July 29, 2019.  (Doc. 59-1 at 17, 28.)  The Medication Administration Record shows that 60-tablet refills were dispensed as KOP each month, and there were 5 refills.  (*Id.*)

---

[2] That part of the Medication Administration Record documenting the "quantity dispensed" shows that on July 9, 2019, just one Metformin tablet was dispensed, rather than 60 tablets.  (Doc. 59-1 at 25.)  Defendants do not explain this discrepancy.  But because Deng alleges that he did not run out of Metformin until August 2019, it appears that this is a typographical error in the Medication Administration Record form and that he received a one-month supply refill on July 9, 2019.

The Drug Prescription Orders form shows that on February 7, 2019, a new prescription for Atorvastatin (1 tablet once a day) was ordered; this prescription was set to expire on August 15, 2019.  (Doc. 59-1 at 17.)  The same form shows that a new prescription for Atorvastatin was ordered on August 8, 2019 and was set to expire on February 7, 2020.  (*Id.*)  However, there is no corresponding Drug Prescription Order form for this August 8, 2019 order, nor is there a Medication Administration Record showing that Atorvastatin was ever dispensed on or around August 8, 2019.  (*See* Doc. 59-1.)

## B.    Medication Delay in August-September 2019

On August 11, 2019, Deng submitted an HNR informing medical that he was about to run out of his KOP medications; specifically, Metformin, Glipizide, Lisinopril, Aspirin, Simvastatin (Atorvastatin), and Naproxen.  (Doc. 59-1 at 32.)  The HNR form shows that on August 17, 2019, Nurse A. Snyder issued an HNR response informing Deng that it was "too soon on Atorvastatin," and that the provider was notified to renew all other medications.  (*Id.*)

On August 18, 2019, Deng sent another HNR to medical informing them that he had not received his medications and had been without his medications for five days.  (Doc. 67 at 10.)  He wrote that he is a diabetic and has been advised he must take his medications daily, and he listed the medications his needs—Metformin, Glipizide, Lisinopril, Aspirin, Simvastatin/Atorvastatin, and Naproxen.  (*Id.*)  The next day, Deng received a response from a medical staff member informing him that "provider notified to renew all meds." (*Id.*)  But Deng did not receive his medications.

On August 20, 2019, Deng spoke to Nurse Westlake when she came through the unit to deliver medications; she told Deng that she would notify NP Ortiz again about his medications.  (Doc. 12 at 12.)  Thereafter, Deng still did not receive his medications.  (*Id.*)

On August 28, 2019, Deng submitted an informal complaint about the medication delay and wrote that he had been without his medications for 14 days.  (Doc. 67 at 11.)  He wrote that he submitted a refill request for his KOP medications on August 11, 2019,

notifying medical that his KOP medications were about to run out.  (*Id.*)  There was no response to the informal complaint.  (*Id.* at 13.)

On September 7, 2019, Deng submitted an HNR requesting to see a doctor or nurse immediately because he did not feel well; he wrote that he is a diabetic and had been without his KOP diabetic medications for over 25 days.  (Doc. 67 at 12.)  The HNR response, dated September 10, 2019, informed Deng that the medications had been ordered and should arrive on September 11, 2019, and that he was scheduled on the nurse line.  (*Id.*)  Deng was not seen by medical at that time.

Meanwhile, on September 8, 2019, Deng submitted an emergency medical grievance on the issue; he wrote that he had been without his medications for 27 days and had been suffering symptoms for over a week, including dizziness, fatigue, and blurry vision.  (*Id.* at 13.)

On September 9, 2019, NP Ortiz issued new prescription orders for Aspirin, Glipizide, Lisinopril, Metformin, and Atorvastatin.  (Doc. 59-1 at 39–47.)

On September 12, 2019, Deng still had not received his medications; therefore, he submitted an HNR to Nurse Westlake stating that he had spoken to her four times about his KOP diabetic medications but there was no explanation for why he had not received his medications.  (*Id.* at 50.)  Deng wrote that he had not received his medications, and it had been 30 days since he last took his KOP medications.  (*Id.*)  The HNR response, dated September 13, 2019, informed Deng that the medications had been received at the pharmacy on September 11, 2019.  (*Id.*)

Deng finally received his medications on September 14, 2019.  (Doc. 66 at 15, Pl. Aff. ¶ 10.)

On September 16, 2019, Deng saw Nurse Daniel Sherwood, who documented that Deng now had all his KOP medications.  (Doc. 59-1 at 52–53.)  At this encounter, Deng complained about the symptoms he had been experiencing due to the discontinuation of his diabetic medications.  (Doc. 66 at 15, Pl. Aff. ¶ 25.)

On September 20, 2019, a response to Deng's emergency medical grievance was issued by C. Demery, the Facilities Health Administrator.  (Doc. 67 at 15.)  Demery wrote that an investigation was done into Deng's complaint that he had not received his diabetes medication for 26 days, and it was confirmed that he submitted an HNR for refills on August 11, 2019 but did not receive his medications until September 11, 2019.  (*Id.*)[3] Demery informed Deng that "medication nurses on the SMU unit have been re-educated of the process to assure that chronic care medication renewals are completed in a manner that there is no interruption of lapse in the medication."  (*Id.*)

**C.    Medication Delay in March-April 2020**

On March 16, 2020, Deng submitted an Inmate Letter requesting refills for two eye drops—Latanoprost and Timolol—because he had only a 1-week supply left.  (Doc. 67 at 16.)   On March 20, 2020, Deng received the Timolol, but he did not receive the Latanoprost.  (Doc. 31 at 1.)

On March 17, 2020 and March 21, 2020, Deng submitted HNRs to medical requesting Simvastatin (the equivalent of Atorvastatin).  (*Id.* at 2.)

On March 21, 2020, Deng submitted another HNR stating that he had previously submitted an Inmate Letter on March 17 notifying the provider that he was about to run out of Simvastatin, and he had not received a response.  (*Id.*; Doc. 67 at 17.)  Deng wrote that he was not completely out of Simvastatin.  (Doc. 67 at 17.)

On March 25, 2020, Deng submitted another HNR stating that he previously submitted a letter informing the provider that he needed Latanoprost and Timolol and that he received the Timolol on March 20, but no Latanoprost.  (*Id.* at 18.)  In this same HNR, he wrote that he had also submitted a request for Simvastatin on March 21 but received no response.  (*Id.*)  Deng wrote that he now also needed his Aspirin refilled, and he requested that all these medications be refilled.  (*Id.*)

---

[3] Again, September 11, 2019 was the date that medications were dispensed to the pharmacy.  (Doc. 59-1 at 48.)  The medications were distributed by a nurse to Deng on September 14, 2019.  (Doc. 66 at 15, Pl. Aff. ¶ 10.)

On March 26, 2020, Nurse Williams entered a note in Deng's medical record documenting Deng's report that he had submitted a letter informing the provider he needed Latanoprost and Timolol, that he received only the Timolol, that he also sent a request for a Simvastatin refill but received no response, and that he needed Aspirin.  (Doc. 28-5 at 2–3.)  The medical record shows that NP Ortiz conducted a "Practitioner Review" of this medical record, apparently on the same day, as no other date is indicated in the "Practitioner Review" section of the medical record.  (*Id.* at 4.)

On March 27, 2020, Deng submitted an Inmate Letter to medical requesting Metformin because he had run out.  (Doc. 67 at 19.)[4]  Deng received a response the next day informing him that a chart note was sent to the provider to renew the medication, and if it was not refilled in 6 days, to submit another HNR.  (*Id.*)

On March 31, 2020, Deng received a response to his March 16, 2020 Inmate Letter requesting Latanoprost and Timolol; the response stated that the refill request was sent for Timolol but "will need to see provider for renewal of Latanoprost."  (*Id.* at 16.)

On April 5, 2020, Deng submitted an informal complaint stating that he had informed the provider via HNRs and Inmate Letters that he was out of his KOP medications: Latanoprost, Simvastatin, Metformin, and Aspirin.  (*Id.* at 20.)  He wrote that he had been out of Metformin—the main medication to treat his diabetes—for nine days.  (*Id.*)  There was no response to the informal complaint.  (Doc. 31 at 4.)

On April 15, 2020, Deng filed a Motion for Preliminary Injunction requesting that the Court direct Defendants to provide him his KOP medications.  (Doc. 23.)

On April 18, 2020, a medical order was placed for Metformin.  (Doc. 28-1 at 2.)  On April 21, 2020, Deng received the Metformin.  (*Id.*)

On April 19, 2020, Deng submitted an emergency medical grievance about the medication issue.  (Doc. 31 at 4.)

---

[4] Deng wrote that he was using an Inmate Letter form because HNR forms were not available.  (Doc. 67 at 19.)

On April 27, 2020, Defendants moved for an extension of time to file a response to Deng's Motion for Preliminary Injunction.  (Doc. 25.)  The Court granted an extension to April 30, 2020.  (Doc. 26.)

On April 28, 2020, medical orders were placed for Latanoprost drops, Atorvastatin, and Aspirin.  (Doc. 28-1 at 2.)  On April 30, 2020, Deng received these three medications.  (Doc. 31 at 2.)[5]

On December 16, 2020, Deng was transferred from ASPC-Eyman SMU I to the Eyman Cook Unit.  (Doc. 66 at 14, Pl. Aff. ¶ 3.)

## IV.    Claim against NP Ortiz

### A.    Legal Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need."  *Id.* (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately

---

[5] Because Deng received the medications, the Motion for Preliminary Injunction was denied without prejudice.  (Doc. 46.)

indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'"  *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### B.    Analysis

Defendants do not challenge that Deng's conditions constituted serious medical needs.  (*See* Doc. 58.)  Diabetes is a serious medical need.  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003).  Deng's other conditions—glaucoma and hypertension—are also serious medical needs.  *See Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (stating that monocular blindness is a serious medical need, and noting that "other courts have held that similar and even less severe losses of vision are serious medical needs"); *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) ("glaucoma may constitute a serious medical condition"); *Lozano v. Rose*, No. CV 16-764-JVS (AGR), 2016 WL 11523593, at *5 (C.D. Cal. Nov. 9, 2016) (the prisoner's diabetic retinopathy and glaucoma support a serious medical need).  Due to his diagnosed medical conditions, Centurion classified Deng as a patient requiring chronic care, and it is undisputed he has been prescribed medications to treat his conditions for years.  (Doc. 12 at 11; *see* Doc. 28-3 at 2–3.)  Thus, Deng satisfies the objective prong of the deliberate indifference analysis.

The Court therefore moves to the subjective prong—whether NP Ortiz's response to Deng's serious medical needs amounted to deliberate indifference.  *See Jett*, 439 F.3d at 1096.  The initial question in the deliberate indifference analysis is whether NP Ortiz knew of Deng's serious medical need.  *See Jett*, 439 F.3d at 1097.

Deng's medical conditions are documented in each of his prison medical records, as is the fact that he is designated a chronic care patient for his conditions. (*See* Doc. 59-1 at 34–35.) NP Ortiz avers that she has treated Deng for his medical conditions since July 1, 2019. (*Id.* at 59, Ortiz Decl. ¶ 4.) But Deng's medical records show that NP Ortiz issued prescription orders for Glipizide and Metformin in January and February 2019. (*Id.* at 24, 28.) Regardless, there is no dispute that at the time Deng's claim related to medication delays arose in August 2019, NP Ortiz was aware of Deng's conditions and serious medical need.

Defendants argue that NP Ortiz responded reasonably to Deng's serious medical need by promptly ordering refills for Deng's chronic care medications once he notified her of the need for refills. (Doc. 58 at 9–10, 12.) Defendants maintain that Deng failed to properly notify medical staff in advance of his medications expiring, and that Deng himself was the cause of any delays because he failed to use the instructed procedure to request refills before his medications ran out. (*Id.* at 9–10; Doc. 68 at 3.) According to Defendants, the proper procedure requires prisoners to request refills at least a month in advance of a medication running out, and Ortiz avers that she repeatedly informed Deng that he must submit a refill request for his KOP medications approximately four weeks in advance. (Doc. 58 at 5; Doc. 59-1, Ortiz Decl. ¶ 8.)

Deng disputes that he was ever told of a proper procedure for KOP refills, and he asserts that there was no medication refill procedure in place at SMU I, and if there was, he never heard of it. (Doc. 67 ¶ 26; Doc. 66, Pl. Aff. ¶ 11.) Notably, Defendants do not point to any written medication refill procedure policy, nor do they show that such a procedure was set forth in a prisoner handbook or orientation handout. There is no reference to a proper refill procedure in Deng's medical records or contemporaneously made documentation that he was instructed as to a particular procedure. (*See* Doc. 59-1.) As mentioned, Deng filed a medical grievance complaining that his medications were not timely refilled, and the response from the Facilities Health Administrator did not admonish Deng for failing to follow a refill procedure or submit his requests earlier; rather, the

response stated that nurses in the SMU unit required training on the medication renewal process to ensure there would be no lapses in medication.  (Doc. 67 at 15.)  In short, there is a material factual dispute whether there was a standard medication refill procedure requiring refill requests to be submitted one month in advance and whether Deng was informed of such procedure.

NP Ortiz avers that when a prisoner submits an HNR for a refill, it is sent to her for review, and this review can take "several days" to complete because she must review all outstanding HNRs for the entire unit.  (Doc. 59-1 at 59, Ortiz Decl. ¶ 9.)  Once she approves a prescription refill, it is sent to the pharmacy to be ordered, and it may take several additional days before the medication is received by the pharmacy and distributed to the prisoner.  (*Id.*)  As Deng points out, this process should take a week at the most.  (Doc. 67 ¶ 30.)

The record shows that Deng submitted his first refill request for Metformin, Glipizide, Lisinopril, and Atorvastatin on August 11, 2019.  (Doc. 59-1 at 32.)  Deng continued to file more HNRs requesting his medications, and then he filed an informal complaint and emergency medical grievance.  (*Id.*; Doc. 67 at 10–13; Doc. 59-1 at 39–47.)  The Court infers that NP Ortiz was aware of Deng's HNRs and repeated requests for medication refills.  *See Jett*, 439 F.3d at 1094, 1097 (a plaintiff opposing summary judgment is entitled to an inference that the defendant prison doctor was aware of the medical slips the plaintiff continued to submit asking to be sent to a specialist for treatment for a fractured thumb).  The record shows that NP Ortiz did not take any action for almost a month, when she issued new prescription orders on September 9, 2019.  (Doc. 59-1 at 39-47.)  Deng finally received his medications 32 days after submitting his initial written request for refills.

On March 16, 202, Deng submitted refill requests for Latanoprost and Atorvastatin. (Doc. 67 at 16; Doc. 31 at 2.)  On March 27, 2020, he submitted a refill request for Metformin.  (Doc. 67 at 19.)  Despite repeated HNRs and Inmate Letters following up on these requests, and an informal complaint and emergency medical grievance on the issue,

- 12 -

1    a prescription order for Metformin was not issued until April 18, 2020, and the orders for

2    Latanoprost and Atorvastatin were not issued until April 28, 2020. (Doc. 28-1 at 2.) Again,

3    the Court infers that NP Ortiz, as the treating practitioner, was aware of Deng's HNRs and

4    requests for refills. (*See* Doc. 28-3 at 3.) *See Jett*, 439 F.3d at 1094, 1097. Defendants

5    provide no explanation for the 28-day delay in providing Metformin and the 42-day and

6    43-day delays in providing Latanoprost and Atorvastatin. (*See* Doc. 58.)[6]

7         A reasonable jury could conclude that 32-day, 28-day, 42-day, and 43-day delays in

8    medication refills were significant, and that NP Ortiz—who knew Deng was a diabetic—

9    was aware of Deng's refill requests and need for medications yet failed to take reasonable

10   steps to ensure that he timely received his medications. *See Richmond v. Huq*, 885 F3d

11   928, 942 (6th Cir. 2018) (defendant doctor may be deliberately indifferent where doctor

12   was aware of the prisoner's serious need for medication but failed to take reasonable steps

13   to ensure the prisoner timely received such medication); *Sellers v. Henman*, 41 F.3d 1100,

14   1102–03 (7th Cir. 1994) (deliberately withholding medical treatment needed by a prisoner

15   to avoid a diabetic crisis would violate the Eighth Amendment if the defendants knew of

16   the risk). Accordingly, there is a question of fact whether NP Ortiz acted with deliberate

17   indifference to Deng's serious medical need.

18        The final question in the Eighth Amendment analysis is whether Deng suffered

19   harm as a result of NP Ortiz's deliberate indifference. *See Jett*, 439 F.3d at 1096; *Hunt*,

20   865 F.2d 198. Defendants contend that Deng cannot show any evidence of damage or

21   injury related to NP Ortiz's inaction or that he was harmed in any way as a result of the

22   delays in receipt of medications. (Doc. 58 at 10.)

23

24

-------------------

25        [6] In their Motion for Summary Judgment, Defendants do not address the medication

26   delays that occurred in March-April 2020. (*See* Doc. 58.) They purport that Deng's lawsuit
     is limited to the August-September 2019 events. (*Id.* at 2; Doc. 59 5.) As the Court

27   explained in its August 3, 2020 Order, because Deng seeks injunctive relief, the Court
     considers facts that arose after the filing of his Second Amended Complaint, including the

28   March-April 2020 events because these facts concern the same allegedly unconstitutional
     conduct by Defendants. (Doc. 46 at 8 n.2.) *See Farmer*, 511 U.S. at 846.

Deng avers that after going without his diabetic medication, he experienced dizziness, fatigue, headaches, and blurry vision, and that these symptoms significantly affected his daily activities.  (Doc. 66 at 15, Pl. Aff. ¶ 9; Doc. 67 at 22.)  *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (a declarant has personal knowledge of his or her own symptoms); *see also Lolli*, 351 F.3d at 419 (diabetes is a "serious illness that can produce harmful consequences if left untreated for even a relatively short period of time").  Deng's symptoms could be found to constitute harm sufficient to support an Eighth Amendment claim.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *Jett*, 439 F.3d at 1096 ("[a] prisoner need not show his harm was substantial" under the subjective standard); *see also Bussiere v. Kokor*, No. 1:13-cv-01565-AWI-SKO, 2017 WL 840665, at *10 (E.D. Cal. March 2, 2017) (genuine issue of material fact whether the plaintiff suffered the requisite harm under subjective test where the plaintiff went without Prilosec for 7 days because the defendant declined to refill the prescription, which resulted in the plaintiff suffering from symptoms of acid reflux disease), *R&R adopted in part and rejected in part on other grounds by* 2017 WL 1231822 (E.D. Cal. April 4, 2017).

In sum, there are questions of fact whether NP Ortiz was deliberately indifferent to Deng's serious medical needs and whether Deng suffered harm as a result.

## C.   Qualified Immunity

Defendants claim that NP Ortiz is entitled to qualified immunity.  (Doc. 58 at 11–12.) Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009) (courts may address either prong first depending on the circumstances

1   in the particular case).  In the qualified immunity analysis, the court must consider all

2   disputed facts in the light most favorable to the nonmovant.  *Isayeva v. Sacramento*

3   *Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

4        NP Ortiz is not a government official; rather, she is an employee of Centurion, a

5   private company contracted by the State to manage healthcare at the prison.  (Doc. 32 ¶ 2.)

6   Defendants assert that contracted prison medical personnel are considered state actors

7   under § 1983 and are therefore entitled to qualified immunity on deliberate indifference

8   claims.  (Doc. 58 at 11, citing *West v. Atkins*, 487 U.S. 42 (1988).)  But *West* held only that

9   contracted prison medical personnel act under color of state law for purposes of § 1983 and

10  are subject to suit; it did not address qualified immunity.  *Id.* at 54.

11       The U.S. Supreme Court has held that prison officers employed by a private prison

12  management firm that contracted with the state were not entitled to qualified immunity.

13  *Richardson v. McKnight*, 521 U.S. 399, 412 (1997).  The Court noted that in the late 19th

14  century, when § 1983 was adopted, although both private contractors and government

15  managed prisons, there was no historical tradition of immunity for private parties carrying

16  out this function; therefore, history did not provide support for qualified immunity.  *Id.* at

17  407.  The Court also looked at the purposes of qualified immunity: (1) protecting against

18  unwarranted timidity on the part of government officials, (2) ensuring that talented

19  candidates are not deterred from entering public service, and (3) preventing distractions by

20  lawsuits.  *Id.* at 409–12.  The Court concluded that none of these purposes supported

21  qualified immunity for private prison officers because marketplace pressures provide

22  incentives to avoid timidity and insufficiently vigorous job performance, and privatization

23  permits private companies to offset increased employee liability risk with higher pay or

24  extra benefits.  *Id.* at 410–11.  Consequently, these private companies "need not operate

25  like a typical government department."  *Id.* at 411.  Finally, the Court found that the risk

26  of distraction from lawsuits alone is not a sufficient ground for immunity.  *Id.*

27       In *Jensen v. Lane County*, the Ninth Circuit relied on *Richardson*'s rationale to find

28  that qualified immunity was not available to a physician who was employed by a private

psychiatric group that contracted with the county to provide mental health care at the jail. 222 F.3d 570, 576–79 (9th Cir. 2000).  Other circuits have also held that private medical providers at jails and prisons are not entitled to the qualified immunity defense.  *See Shields v. Illinois Dept. of Corrs.*, 746 F.3d 782, 794 n.3 (7th Cir. 2014) ("[a]lthough *Richardson* involved a private prison, some circuits (including our own) have applied *Richardson* to private medical providers, holding that they are similarly barred from asserting immunity under § 1983"); *Currie v. Chhabra*, 728 F.3d 626, 631–32 (7th Cir. 2013) (affirming denial of qualified immunity for private health care providers for the jail); *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012) (finding that a private doctor who worked for a non-profit entity that provided mental health care for the Butler County Prison was not entitled to assert qualified immunity).  And in *Garner v. Mohave County*, this Court held that the defense of qualified immunity was not available to individual health care workers who were employed by Corizon Health Inc., which was contracted to provide medical care at the county jail. No. CV-15-08147-PCT-PGR, 2016 WL 695820 at *1–3 (D. Ariz. Feb. 22, 2016).

In light of the above case law, and the fact that NP Ortiz is in the same position as the individual health care workers in *Garner*, the Court finds that NP Ortiz is not entitled to the defense of qualified immunity.

Even if NP Ortiz was eligible for qualified immunity, it would not apply in this case. Defendants argue that NP Ortiz is entitled to qualified immunity because she provided Deng consistent and adequate treatment and there were no constitutional violations.  (Doc. 58 at 12.)  Defendants assert that the law was clear at the time that consistently responding to a prisoner's medicals needs does not amount to deliberate indifference.  (*Id.*)

Defendants' arguments are unavailing.  The Court has already found a question of fact as to whether NP Ortiz violated Deng's Eighth Amendment rights, and disputed issues of fact preclude granting summary judgment on a qualified immunity claim.  *Tennison v. City and Cnty. of S.F.*, 570 F.3d 1078, 1095 (9th Cir. 2009).  Further, because Defendants' argument relies on their own version of the facts, the Court cannot conclude as a matter of law that NP Ortiz is entitled to qualified immunity.  *See Wilkins v. City of Oakland*, 350

F.3d 949, 956 (9th Cir. 2003) ("[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate").

Finally, at the relevant time, it was clearly established that prisoners have a right to medical care. *Estelle*, 429 U.S. at 104–05; *Tuguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). The law prohibiting an intentional denial or delay in medical treatment was also clearly established. *Estelle*, 429 U.S. at 104–105; *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (by 1995 it was "clearly established that the officers could not intentionally deny or delay access to medical care").

In sum, the defense of qualified immunity is not available to NP Ortiz, and, alternatively, qualified immunity is not warranted. Summary judgment will be denied as to the Eighth Amendment medical care claim against NP Ortiz.

**V.    Claim Against Centurion**

**A.    Legal Standard**

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

/ / /

/ / /

**B.      Analysis**

**1.      Constitutional Injury**

The Court has already addressed the first *Monell* prong and found a question of fact as to whether Deng suffered a constitutional injury.

**2.      Policy or Custom**

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.*

Defendants argue that Deng cannot establish that there was a policy or custom that led to the denial of inadequate medical care. (Doc. 58 at 13.) According to Defendants, the record shows that Deng received appropriate medical care for his chronic conditions and that any delay in receipt of medications was due mostly to Deng's own failure to timely

request refills.  (*Id.*)  Defendants describe a process for refills that requires prisoners to submit refill requests one month before a prescription expires.  (*Id.* at 5.)

But Deng expressly disputes that there was any such procedure in place at SMU I or that he was told about any type of process governing refills.  (Doc. 66 at 15, Deng Aff. ¶ 11.)  He argues that even after the delay issues in August-September 2019, Centurion failed to fix the problems, and that they still had no adequate medication refill procedure in place.  (Doc. 31 at 3–4.)  Deng contends that Centurion's practice regarding medication renewals is unconstitutional because it fails to ensure that prisoners receive their medication with no interruption or delay.  (Doc. 66 at 10.)

As mentioned, a policy may be one of inaction; thus, a failure to enact a policy may give rise to a violation of constitutional rights.  *Long*, 442 F.3d at 1185.  The Ninth Circuit "consistently has found that [an entity's] lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the [entity] has other general policies in place."  *Id.* at 1189.  The lack of a needed policy is sufficient for liability where the lack of procedures is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers . . . can reasonably be said to have been deliberately indifferent to the need."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Prisons are constitutionally obligated to provide sufficient medical care to prisoners.  *See Estelle*, 429 U.S. 97.  A prison would expect to have prisoners in its custody who require continued medication for chronic conditions.  It follows that policies would be implemented to address the renewals and refills of medication.  "[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."  *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012) (quoting *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)).

Defendants did not provide any evidence of a written policy or procedure governing medication refills.  (*See* Doc. 59-1.)  In Department Order (DO) 1101, *Inmate Access to Health Care*, which is the ADC policy governing prisoner medical care, there is no

information regarding procedures for medication renewals and refills.[7]  DO 1101 policy provides only that providers must prescribe medications for prisoners as needed; medications must be dispensed in accordance with state and federal law; prisoners may possess no more than a 30-day supply of medications; and, upon receipt of a medication from the pharmacy, a nurse must document receipt of the medication and make it available to the prisoner.[8]

The evidence shows that in 2019, Deng repeatedly submitted requests for medication refills via every avenue he had available—HNRs, informal complaint, medical grievance, and personally speaking with nursing staff.  (*See* Doc. 66 at 15, Deng Aff. ¶ 13.) He was nonetheless subjected a 32-day delay of multiple medications.  Deng avers that at a September 30, 2019 encounter with NP Ortiz, she informed him that they had been having problems with the KOP refill system for a while, and that Ortiz stated "the system has not been working like it [is] supposed to and I've told them about it many times."  (*Id.* ¶ 12.)[9] Despite reports to Centurion about problems with the refill system, in 2020, Deng was again subjected to significant delays of multiple medications.

A reasonable jury could find that the need to establish policies governing the renewal and refills of medications for prisoners was obvious.  In addition, the record supports that Centurion was notified of problems with medication refills, yet refill delays

---

[7] *See* DO 1101, *Inmate Access to Health Care*, https://corrections.az.gov/sites/default/files/policies/1100/1101_032519.pdf (last visited Aug. 12, 2021).

[8] *See id.*, DO 1101 §§ 14.0–14.2.

[9] "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial . . . ."  *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *see Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  The Court considers Deng's statement as to what NP Ortiz told him because Deng can testify at trial as to what NP Ortiz told him, and NP Ortiz can testify at trial and be cross-examined, thus removing any hearsay objection.  *See* 5 Wigmore, Evidence § 1362 (Chadbourn rev., 1974).  Also, Deng's testimony as to what NP Ortiz told him constitutes an admission of a party opponent.  *See* Fed. R. Evid. 801(d)(2)(A) (a statement that is being offered against the opposing party and was made by the opposing party is not hearsay).

- 20 -

1    continued.  Consequently, there is a question of fact as to whether Centurion had sufficient

2    policies in place to ensure that prisoners received timely refills of medication.

3                  **3.      Deliberate Indifferent Policy/Moving Force**

4            The next question is whether Centurion's policy or custom, or lack of a needed

5    policy, amounts to deliberate indifference.  *See Mabe*, 237 F.3d at 1110–11.  Centurion

6    was obligated under the Eighth Amendment to provide adequate medical care, including

7    medication, and a practice of failing to timely renew medications may rise to deliberate

8    indifference.  Likewise, a failure to enact a policy to guide employees and ensure that there

9    are no lapses in medically necessary medication may also rise to deliberate indifference.

10   *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether an entity

11   has a policy of deliberate indifference is generally a jury question).

12           Based on the available record, there is a question of fact whether Deng's injury—

13   dizziness, fatigue, headaches, and blurry vision—would have been avoided had there been

14   a Centurion practice or policy to timely renew prescription medication.  *See Long*, 442 F.3d

15   at 1190 (9th Cir. 2006) (a custom is the moving force behind a constitutional violation

16   when it is "closely related to the ultimate injury" and when the plaintiff can "establish that

17   the injury would have been avoided had proper policies been implemented") (internal

18   quotation marks omitted).

19           Accordingly, there is sufficient probative evidence in the record to create a triable

20   issue as to whether Centurion is liable under *Monell* for failing to timely provide

21   medication refills/renewals.  Summary judgment as to Centurion will be denied.

22   **VI.   Punitive Damages**

23           Defendants seek summary judgment as to Deng's claim for punitive damages on the

24   ground that Deng cannot show Defendants engaged in any conduct based on an evil motive

25   or a reckless or callous disregard for Deng's constitutional rights.  (Doc. 58 at 14.)

26           A request for punitive damages is not a separate claim, but rather a request for a

27   particular relief as to Deng's constitutional claims. In some cases, whether punitive

28   damages are warranted is an issue reserved for the jury.  *See Smith v. Wade*, 461 U.S. 30,

48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").  Here, a reasonable jury could conclude that Defendants' alleged conduct was "motivated by evil motive or intent, . . . or reckless or callous indifference to the federally protected rights of" Deng, thereby warranting punitive damages.  *Id.* at 56.  The request for summary judgment as to punitive damages will be denied.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 58), and the Motion is **denied**.

(2)    This action is referred to Magistrate Judge Michael T. Morrissey to conduct a settlement conference on the remaining claims.

(3)    Defense counsel must arrange for the relevant parties to jointly call Magistrate Judge Michael T. Morrissey's chambers at (602) 322-7680 within 14 days to schedule a date for the settlement conference.

Dated this 20th day of August, 2021.

James A. Teilborg
Senior United States District Judge